**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN BLAUFARB, derivatively on behalf of SOLAREDGE TECHNOLOGIES, INC., | |
| Plaintiff, | Case No. 1:24-cv-04427 |
| vs. | **JURY TRIAL DEMANDED** |
| ZVI LANDO, RONEN FAIER, LIOR DANZIGER, J.B. LOWE, BETSY ATKINS, MARCEL GANI, DANA GROSS, DIRK CARSTEN HOKE, AVERY MORE, TAL PAYNE, and NADAV ZAFRIR, | |
| Defendants, | |
| and | |
| SOLAREDGE TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jonathan Blaufarb ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant SolarEdge Technologies, Inc. ("SolarEdge" or the "Company"), files this Verified Shareholder Derivative Complaint against Zvi Lando ("Lando"), Ronen Faier ("Faier"), Lior Danziger ("Danziger"), J.B. Lowe ("Lowe"), Betsy Atkins ("Atkins"), Marcel Gani ("Gani"), Dana Gross ("Gross"), Dirk Carsten Hoke ("Hoke"), Avery More ("More"), Tal Payne ("Payne"), and Nadav Zafrir ("Zafrir") (collectively, the "Individual Defendants," and together with SolarEdge, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of SolarEdge, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of

1934 (the "Exchange Act"), and against Defendants Lando, Faier, Danziger, and Lowe for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SolarEdge, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by SolarEdge's directors and officers from February 13, 2023 through October 19, 2023, both dates inclusive (the "Relevant Period").

2.      SolarEdge is a solar energy company that designs, produces, and distributes solar power systems, specifically direct current ("DC") optimized inverter solutions for photovoltaic ("PV") systems. Using special solar panels referred to as PV panels, PV systems absorb sunlight and subsequently convert the solar energy into electricity, which can then be used directly or stored in batteries for later use. Among the products and services that SolarEdge produces and sells for their PV systems are power optimizers, inverters, monitoring services, energy storage, and smart energy management through a cloud-based monitoring platform.

3.      SolarEdge's business mainly derives from selling its products to intermediaries, namely large distributors, wholesalers, and large solar installers. These customers ("Distributors")

subsequently then resell, or sell through, the products to installers, engineering, procurement, and construction firms. These firms then install the products to provide solar energy to residential and commercial properties, as well as utility plants. However, despite the passing along of SolarEdge's products through the supply chain, SolarEdge recognizes revenue as the time their Distributors receive product, as opposed to when the product has been sold through.

4.     SolarEdge splits its business into three distinct regions: the United States, Europe, and the Rest of the World ("ROW"). Within these three regions, Europe generates the vast majority of SolarEdge's revenue. In 2022 alone, Europe was responsible for 54.3% of SolarEdge's revenues. This number increased the following year, with 64% of SolarEdge's revenues being generated within Europe. This was repeatedly represented to investors throughout the Relevant Period, with Defendant Danziger, at the time the Company's Director of Investor Relations and Finance Operations, informing investors that large amounts of product are "sold primarily in Europe."

5.     Throughout the Relevant Period, the Company continually touted its success and strength of demand within the European market. The Relevant Period starts on February 13, 2023, when the Company held its investor earnings call (the "FY 2022 Earnings Call") for the fourth quarter and full year for the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"). On the FY 2022 Earnings Call, Defendant Lando, the Company's Chief Executive Officer ("CEO"), repeatedly praised the Company's revenues in Europe, stating, *inter alia*: "A key highlight of 2022 was the growth of our revenues coming from Europe, which ***grew by over 89% year over year***,"[1] "we continue to see ***very strong demand*** from Europe for all products and ***relatively low inventory***

---

[1] All emphasis is added unless otherwise noted.

*levels* in the channel," and "as far as we can see the market is – ***the demand is good, and the market is strong***."

6. However, plaintiff's counsel in the Securities Class Action (defined below) interviewed nine former employees of SolarEdge (the "CWs"), who confirmed that, contrary to what was being represented by the Company, business in Europe was not only struggling throughout the Relevant Period, but the Individual Defendants were aware of it. Indeed, the CWs revealed that the reason SolarEdge was not only performing so well in Europe, but even hitting its revenue targets at all, was due to a practice of forcing Distributors to take unneeded products at the end of a financial quarter (the "Unneeded Product Misconduct"). The Company achieved this by shipping product to Distributors early, giving Distributors additional time to pay by extending payment periods, and offering "free carrier shipping terms" to Distributors, allowing the Company to get product off its books and transfer ownership of the product before the product was even shipped. This allowed SolarEdge to recognize the orders as revenue, thus artificially increasing the revenue at the end of the quarter.

7. These practices had more ramifications than just artificially inflated revenues however, as by forcing Distributors to take product that they could not sell, SolarEdge was also inflating the amount of product within Distributor inventories ("Channel Inventories"). The oversaturation of the Channel Inventories also caused the Company's internal inventory for products that were ready for sale ("Finished Goods Inventory") to oversaturate as well. For example, prior to the start of the Relevant Period, the Finished Goods Inventory held $202 million of product. By the end of the first quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), that amount had grown to $303 million, an increase of 64.4%. By the end of the second quarter of the 2023 Fiscal Year, that number had risen even more to $487 million, a further

increase of 46.4%. By the end of the third quarter of the 2023 Fiscal Year, just before the end of the Relevant Period, the Finished Goods Inventory had grown to an astronomical $731 million, a total increase of 261.9% from the start of the Relevant Period.

8.      On August 1, 2023, after the market had closed, the truth began to emerge when SolarEdge hosted its investor earnings call for the second quarter of the 2023 Fiscal Year (the "2Q 2023 Earnings Call"). The 2Q 2023 Earnings Call revealed that the Company was experiencing a drop in demand as well as excess Channel Inventory in Europe, contrary to the Company's prior assertions. Specifically, Defendant Lando stated that "[t]he solar market is going through a transition, emerging from the recent period of component shortages, high energy prices, and rapid growth to one now impacted by higher interest rates *and excess inventory*." The reason for the excess inventory was, according to Defendant Lando, because "***growth in demand has tapered off***, distributors are taking a more cautious approach in order to better manage their cash flow."

9.      The news of excess inventory and low demand impacted the financial guidance for the upcoming third quarter. Defendant Faier, the Company's Chief Financial Officer ("CFO"), revealed that there was an estimated decline in revenues, down from $947.4 million in the second quarter to between $850 million and $890 million for the third quarter, as well as a gross margin decline from 34.7% to between 30% and 33%. The Individual Defendants attempted to ease any potential concerns with the disappointing guidance by continuing to conceal crucial information to investors. In trying to downplay his earlier comments, Defendant Lando stated that European market's general strength was only "somewhat more moderate than what was anticipated heading into 2023," and that "[i]n Europe, ***installation rates continue to be high in both residential and commercial***," "our growth in Europe in the second quarter was very strong," and that "***sell-through by our distributors in the second quarter was up***."

10.     However, the Company's stock price still took a hit. On this news, the Company's share price dropped $43.96 per share, or 18.3%, from a closing price of $239.47 per share on August 1, 2023, to close at a price of $195.51 per share on August 2, 2023.

11.     The truth did not fully emerge until October 19, 2023. That day, after the markets closed, the Company published a press release announcing its preliminary financial results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Press Release"). The 3Q 2023 Press Release revealed that "[d]uring the second part of the third quarter of 2023, we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors." The 3Q 2023 Press Release further revealed that "third quarter revenue, gross margin and operating income *will be below the low end of the prior guidance range*," and that the Company "anticipates significantly lower revenues in the fourth quarter of 2023." This information caught investors by shock as the Individual Defendants had continued to reassure investors that "underlying demand for solar is very, very strong," and that "the data we see from our distributors is *continuing to show significant growth in terms of sell-throughs into Europe*" less than a month prior.

12.     On this news, the Company's share price dropped a further $31.08 per share, or 27.2%, from a closing price of $113.98 per share on October 19, 2023 to close at a price of $82.90 per share on October 20, 2023.

13.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe,

the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

14.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public while, during the Relevant Period, one of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of approximately $16,710.

15.     Additionally, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls and participated and/or facilitated the Company's participation in the Unneeded Product Misconduct.

16.     In light of the Individual Defendants' misconduct—which has negatively impacted the value of the Company and subjected the Company, its CEO, its CFO, its Director of Investor Relations and Finance Operations, and its Head of Investor Relations to a consolidated federal securities class action lawsuit currently pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to remedy the Unneeded

Product Misconduct, the need to implement adequate internal controls, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the collective engagement in and/or facilitation of the Company's engagement in the Unneeded Product Misconduct, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Lando's, Defendant Faier's, Defendant Danziger's, and Defendant Lowe's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

**PARTIES**

**Plaintiff**

23.     Plaintiff is a current shareholder of SolarEdge. Plaintiff has continuously held SolarEdge common stock at all relevant times.

**Nominal Defendant SolarEdge**

24.     Nominal Defendant SolarEdge is a Delaware corporation with its principal executive offices located at 1 HaMada Street, Herziliya Pituach, 4673335, Israel. SolarEdge shares trade on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "SEDG."

**Defendant Lando**

25.     Defendant Lando has served as CEO of the Company and as a Company director since February 2020. Prior to being CEO, Defendant Lando was Vice President of Global Sales for the Company from 2009 until 2019, when Defendant Lando was named as interim CEO for the Company. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 26, 2024 (the "2024 Proxy Statement"), as of April 8, 2024, Defendant Lando beneficially owned 102,087 shares of the Company's common stock. Given that the price per share of the

Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Lando beneficially owned approximately $6.8 million worth of SolarEdge stock as of that date.

26.     For the 2023 Fiscal Year, Defendant Lando received $7,500,450 in total compensation from the Company. This included $816,851 in salary, $6,558,293 in stock awards, and $125,306 in all other compensation.

27.     The 2024 Proxy Statement states the following about Defendant Lando:

> Mr. Lando joined SolarEdge in 2009 as our Vice President, Global Sales.
>
> We announced the appointment of Mr. Lando as our Acting Chief Executive Officer in August 2019 and as a director of our Board of Directors and permanent CEO on February 9, 2020. Mr. Lando had previously spent 16 years at Applied Materials, a materials engineering company focused on semiconductor, flat panel display and solar photovoltaic industries, based in Santa Clara, California, where he held several positions, including process engineer for metal deposition and chemical vapor deposition systems, business manager for the Process Diagnostic and Control Group. His last position at Applied Materials was Vice President and General Manager of Baccini Cell Systems Division of the Solar Business Group, which he held from January 2008 to March 2009. Mr. Lando holds a B.S. in Chemical Engineering from the Technion, Israel's Institute of Technology in Haifa, and is the author of several publications in the field of chemical deposition.
>
> Mr. Lando's historical knowledge of our company and his experience at other technology companies provides a valuable perspective to our Board.

**Defendant Faier**

28.     Defendant Faier has served as the CFO of the Company since 2011. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Faier beneficially owned 118,750 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Faier beneficially owned approximately $7.9 million worth of SolarEdge stock as of that date.

29.    For the 2023 Fiscal Year, Defendant Faier received $2,802,322 in total compensation from the Company. This included $503,614 in salary, $2,219,298 in stock awards, and $79,410 in all other compensation.

30.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Faier made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|-----------------|-----------------|----------|
| June 1, 2023 | 57 | $293.16 | $16,710 |

Thus, in total, before the fraud was exposed, he sold 57 shares of Company stock on inside information, for which he received approximately $16,710 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

31.    The 2024 Proxy Statement stated the following about Defendant Faier:

Mr. Faier joined SolarEdge in 2011 as our Chief Financial Officer. Prior to joining SolarEdge, Mr. Faier served from 2008 to 2010 as the chief financial officer of Modu Ltd, a privately owned Israeli company. Between 2004 and 2007, Mr. Faier held several senior finance positions, including chief financial officer at M-Systems prior to its acquisition by SanDisk Corporation in 2006. Previously, Mr. Faier served as corporate controller of VocalTec Communications Ltd. Mr. Faier holds a CPA (Israel) license, an MBA (with Honors) from Tel Aviv University and a B.A. in Accounting and Economics from the Hebrew University in Jerusalem. Mr. Faier currently serves on the board of directors of Monday.com Ltd and Kaltura Inc.

**Defendant Danziger**

32.    Defendant Danziger has served as the Company's Director of Investor Relations and Finance Operations from before the beginning of the Relevant Period until at least June 2021. At all times during the Relevant Period, Defendant Danziger was authorized to speak, and at times did speak, to investors and analysts on behalf of the Company.

**Defendant Lowe**

33.     Defendant Lowe has served as the Company's Head of Investor Relations throughout the Relevant Period. At all times during the Relevant Period, Defendant Lowe was authorized to speak, and at times did speak, to investors and analysts on behalf of the Company.

**Defendant Atkins**

34.     Defendant Atkins has served as a Company director since 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Technology Committee, and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Atkins beneficially owned 2,620 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Atkins beneficially owned approximately $175,409 worth of SolarEdge stock as of that date.

35.     For the 2023 Fiscal Year, Defendant Atkins received $297,330 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $194,830 in stock awards.

36.     The 2024 Proxy Statement stated the following about Defendant Atkins:

Ms. Atkins has served as a member of our Board of Directors since 2021.

Ms. Atkins is a seasoned business-woman and serial entrepreneur with two decades of experience serving on some of the world's most visible global public company boards. She served as the CEO of Baja Corporation, an independent venture capital firm focused on technology, renewable energy and life sciences, since 1994. She has previously served as CEO and Chairperson of SaaS company Clear Standards, Inc., an energy management and sustainability software company, a position she held between February and August 2009. She also served as CEO of Key Supercomputer, focused on seismic analytics, applying AI machine learning technology to pinpoint reserves using predictive and prescriptive analytics, between 2008 and 2010 and as CEO of NCI, Inc., a food manufacturer creating Nutraceutical and Functional Food products.

In addition, Ms. Atkins is a highly acclaimed public company Board Director and author. For 20 years, she has worked behind the scenes at companies like Schneider, Lucent, Vonage, SunPower Corp, Paychex and Nasdaq Inc. Ms. Atkins started her business career as an entrepreneur co-founding several successful high tech, energy and consumer companies including Ascend Communications. Ms. Atkins is an effective operational leader, having served as CEO three times and she has a strong global and operational perspective encompassing the full range of experience from growth to restructuring and is a recognized ESG and Governance thought leader. Her corporate board experience covers industries including Technology, Energy Management, Solar, Industrial Automation, Manufacturing, Automotive, and Logistics.

Ms. Atkins brings the knowledge of leveraging next gen digital technologies, is an innovative entrepreneur for tech enablement for the future of work for manufacturing 4.0 initiatives (i.e. applying industrial Internet of Things, or IIoT, for preventative maintenance in the Industrial, Automotive, and Aerospace sectors). Ms. Atkins has a global, broad perspective on energy from her role as Lead Director at SunPower Corporation, the renewable solar company, and Schneider Electric, SA, the energy efficiency infrastructure monitoring and industrial automation process control company, where she served from 2005 to 2012 and 2011 to 2019, respectively. She also served on the boards of Covetrus, Inc. and its predecessor, Vets First Choice, a pharmaceutical company, from February 2016 until September 2019, Cognizant Technology Solutions Corporation, an information technology services company, from April 2017 to October 2018 and HD Supply, Inc., an industrial distributor, from September 2013 to April 2018. Her areas of experience include Artificial Intelligence, Seismic Analytics, Internet of Things (IoT), using technology to digitize processes driving accuracy and productivity, Cyber Security, Mobile and SaaS. Ms. Atkins currently serves on the public boards of Wynn Resorts, Limited, and Enovix Corporation. Ms. Atkins also serves on the public board of SL Green Realty Corp but has informed SL Green Realty Corp that she will be resigning from her directorship effective from the date her successor is duly elected and qualified in SL Green Realty Corp's 2024 annual meeting of stockholders.

Ms. Atkins holds a degree in liberal arts from the University of Massachusetts, Magna Cum Laude.

Ms. Atkins brings to the Board valuable business experience through her years of experience as a chief executive officer with technology and energy companies, her extensive experience in ESG, and her experience as a director of other public companies.

**<u>Defendant Gani</u>**

37. Defendant Gani has served as a Company director since 2015. He also serves as the Chair of the Audit Committee. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Gani beneficially owned 29,049 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Gani beneficially owned approximately $1.9 million worth of SolarEdge stock as of that date.

38. For the 2023 Fiscal Year, Defendant Gani received $297,330 in total compensation from the Company. This included $102,500 in fees earned or paid in cash and $194,830 in stock awards.

39. The 2024 Proxy Statement stated the following about Defendant Gani:

Mr. Gani has served as a member of our Board of Directors since 2015.

Since 2009, Mr. Gani has served as an independent consultant to various start-up companies, and between November 2009 and June 2010 acted as chief executive officer for New Pax, a private company. From 2005 to 2009, Mr. Gani lectured at Santa Clara University, where he taught classes on accounting and finance. In 1997, Mr. Gani joined Juniper Networks, Inc. where he served as chief financial officer and executive vice president from December 1997 to December 2004, and as chief of staff from January 2005 to March 2006. Prior to joining Juniper, Mr. Gani served as Chief Financial Officer at various companies, including NVIDIA Corporation, Grand Junction Networks, Primary Access Corporation and Next Computers. Mr. Gani served as corporate controller at Cypress Semiconductor from 1991 to 1992. Prior to joining Cypress Semiconductor, Mr. Gani worked at Intel Corporation from 1978 to 1991. Mr. Gani holds a B.A. in Applied Mathematics from Ecole Polytechnique Federal and an M.B.A. from University of Michigan, Ann Arbor.

Mr. Gani brings valuable financial and business experience to our Board through his years of experience as a chief financial officer with public companies and past experience as a director of other public companies.

**Defendant Gross**

40. Defendant Gross has served as a Company director since 2023. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 8, 2024,

Defendant Gross beneficially owned 969 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Gross beneficially owned approximately $66,875 worth of SolarEdge stock as of that date.

41.     For the 2023 Fiscal Year, Defendant Gross received $368,686 in total compensation from the Company. This included $41,250 in fees earned or paid in cash and $327,436 in stock awards.

42.     The 2024 Proxy Statement stated the following about Defendant Gross:

Ms. Gross has served as a member of our Board of Directors since 2023.

Ms. Gross brings over 25 years of strategic and financial expertise to the Board of Directors from technology companies ranging from fintech to AI. Ms. Gross is Head of Strategic Initiatives at Fiverr International Ltd., an online marketplace, since 2022. She previously served as Chief Operating Officer of Prospera Technologies, an AI Agtech company, between 2016 and 2021 and later as Chief Strategy Officer (CSO) at Prospera Technologies between 2021 and 2023. She has also previously held the role of Chief Financial Officer at eToro, a fintech company, and has served on the boards of such companies as M-Systems, AudioCodes, and Power Dsine. She was also a venture partner at one of Israel's leading venture capital fund, Viola Ventures. Ms. Gross has also held various executive management positions at M-Systems from 1992 to 2006, when it was ultimately acquired by SanDisk, and as CEO of Btendo, a start-up company that developed MEMS based PICO projection solutions, until it was acquired by ST Microelectronic in 2012. Ms. Gross holds a BSc in Industrial Engineering from Tel Aviv University and an MBA from San Jose University.

Ms. Gross brings valuable financial, strategic and business experience to our Board through her years of experience in both executive financial and strategic roles at public companies.

**Defendant Hoke**

43.     Defendant Hoke has served as a Company director since 2022. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Hoke beneficially owned 1,761 shares of the Company's

common stock. Given that the price per share of the Company's stock at the close of trading on

April 8, 2024 was $66.95, Defendant Hoke beneficially owned approximately $117,899 worth of

SolarEdge stock as of that date.

44.     For the 2023 Fiscal Year, Defendant Hoke received $272,330 in total compensation

from the Company. This included $77,500 in fees earned or paid in cash and $194,830 in stock

awards.

45.     The 2024 Proxy Statement stated the following about Defendant Hoke:

Mr. Hoke has served as a member of our Board of Directors since 2022.

Mr Hoke has a career that spans almost 30 years and five continents in various
industries. Since 2022 Mr. Hoke has served as the Chief Executive Officer of
Volocopter, a pioneer of the Urban Air Mobility (UAM), launching first
commercial operation in 2024. Prior to this role, Mr. Hoke served from 2016 until
2021 as the Chief Executive Officer of Airbus Defence and Space, a provider of
defense, space, and security systems and also served as a member of Airbus' Global
Executive Committee. Prior to that, he held various executive positions at Siemens,
including General Manager for the Transrapid Propulsion and Power Supply
Subdivision, President of Siemens Transportation Systems China, Chief Executive
Officer of Siemens Africa, Chief Executive Officer Industrial Solutions, Chief
Executive Officer Customer Services and Chief Executive Officer Large Drives.

Mr. Hoke resides in Germany and serves on the Board of Advisors of Voyager
Space and on the Board of Directors of Spire Global.

He holds a degree in Mechanical Engineering from the Technical University of
Brunswick, Germany and is an Alumni of the Young Global Leader Program of the
World Economic Forum.

Mr. Hoke brings valuable business experience to our Board through his years of
experience as a chief executive officer with technology companies and experience
as a director of other public companies.

**Defendant More**

46.     Defendant More has served as a Company director since 2006. He also serves as

the Chair of the Compensation Committee and the Chair of the Technology Committee. According

to the 2024 Proxy Statement, as of April 8, 2024, Defendant More beneficially owned 77,446

shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant More beneficially owned approximately $5.1 million worth of SolarEdge stock as of that date.

47.     For the 2023 Fiscal Year, Defendant More received $309,622 in total compensation from the Company. This included $114,792 in fees earned or paid in cash and $194,830 in stock awards.

48.     The 2024 Proxy Statement stated the following about Defendant More:

Mr. More has served as a member of our Board of Directors since 2006.

Mr. More was the sole seed investor in the Company through his fund, ORR Partners, and participated in all successive rounds. Mr. More continues to invest in technology companies, with ORR Partners, Innoventions Capital and More Family Investments entities. Previously, Mr. More was the president and chief executive officer of CompuCom Systems Inc. from 1989 to 1993. Mr. More currently serves on the board of directors of several private companies, BuzzStream, AppDome, HolistiCyber Ltd., senseIP, and SageCyber.

Mr. More's historical knowledge of our company and his experience as a director of other technology companies provides a valuable perspective to our Board.

**Defendant Payne**

49.      Defendant Payne has served as a Company director since 2015. She also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Payne beneficially owned 3,227 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Payne beneficially owned approximately $216,048 worth of SolarEdge stock as of that date.

50.     For the 2023 Fiscal Year, Defendant Payne received $277,330 in total compensation from the Company. This included $82,500 in fees earned or paid in cash and $194,830 in stock awards.

51.     The 2024 Proxy Statement stated the following about Defendant Payne:

Ms. Payne has served as a member of our Board of Directors since 2015.

Tal Payne brings over 15 years of financial management experience. She previously served as Chief Financial Officer at Check Point Software Technologies Ltd., a leading provider of cyber security solutions to governments and corporate enterprises globally from 2008 to 2023. During her tenure, Ms. Payne has held the position of Chief Financial and Operations Officer from 2015, overseeing the company's global operations and finance, including investor relations, legal, treasury, purchasing and facilities. Ms. Payne served as Chief Financial Officer at Gilat Satellite Networks Ltd., where she held the role of Vice President of Finance for over five years.

She began her career as a CPA in public accounting at Pricewaterhouse Coopers. Ms. Payne holds a B.A. in Economics and Accounting and an Executive M.B.A., both from Tel Aviv University. Ms. Payne served on the board of IronSource Ltd. between 2021 and until 2023, when Ironsource merged with Unity Software Inc.

Ms. Payne brings valuable financial and business experience to our Board through her years of experience as a chief financial officer with publicly traded companies.

**Defendant Zafrir**

52.     Defendant Zafrir has served as a Company director since 2019. He also serves as the Chair of the Board, as a member of the Compensation Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Technology Committee. According to the 2024 Proxy Statement, as of April 8, 2024, Defendant Zafrir beneficially owned 7,515 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 8, 2024 was $66.95, Defendant Zafrir beneficially owned approximately $503,129 worth of SolarEdge stock as of that date.

53.     For the 2023 Fiscal Year, Defendant Zafrir received $968,813 in total compensation from the Company. This included $425,000 in fees earned or paid in cash and $543,813 in stock awards.

54.     The 2024 Proxy Statement stated the following about Defendant Zafrir:

Mr. Zafrir joined our Board of Directors in 2019 and serves as the Chairperson.

Bringing thirty years of experience in management, leadership, and technology innovation, Mr. Zafrir has been the co-founder and Managing Partner of Team8, a global venture group that builds and backs technology companies at the intersection of artificial intelligence, cybersecurity, data, fin-tech, enterprise software, and infrastructure since 2014. Prior to founding Team8, Nadav spent 20 years in the Israel Defense Forces. He served as Commander of Unit 8200, Israel's elite military technology unit, where he established the Israel Defense Forces Cyber Command. He holds an LLB from the Interdisciplinary Center Herzliya (IDC) and an Executive MBA from the Kellogg - Recanati program of the Kellogg Graduate School of Business at Northwestern University in Chicago and the Recanati School of Business at Tel Aviv University.

Mr. Zafrir's technological expertise and former work experience with some of our senior management provides our board and the management team with helpful and valuable contribution insights into the business and technology development discussions which further strengthens our executive management.

**Relevant Non-Parties**

55.     The Securities Class Action captioned *In re Solaredge Technologies, Inc. Securities Litigation*, No.: 1:23-cv-09748-GHW, in the United States District Court for the Southern District of New York, incorporates statements from former employees of SolarEdge who offered their experiences as confidential witnesses.[2] The following are the confidential witnesses whose statements are referenced throughout this complaint before this Court.

*CW1*

56.     CW1 worked as a SolarEdge business intelligence administrator in the Company's Milpitas, California office ("Milpitas") from May 2022 through October 2023. While at SolarEdge, CW1 reported to Shimon Kringel ("Kringel"), the Vice President of Operations in North America at the time. Kringel reported to Peter Matthews ("Matthews"), the North America General Manager, who reported directly to Defendant Lando. In his role as a business intelligence

---

[2] As was done in the Securities Class Action, all confidential witnesses are referred to in the masculine to preserve their anonymity.

administrator, CW1 would retrieve information from databases for employees in various departments including Finance, Operations, Sales, Sales Operations, and Logistics (referred to as "stakeholders"). Most stakeholders were at the vice president level (the same level as Kringel) and would ask for information concerning products, including information regarding inventory levels, which CW1 would retrieve from the Company's internal database. CW1 either worked with developers to create dashboards reflecting the information sought, or he would give it directly to the stakeholder searching for the information. At the end of each quarter, CW1 would participate on calls with the Company's Business Intelligence team in Israel, where he was able to provide updates on the North America business. CW1 would subsequently be directed to create additional new information dashboards during the following quarter.

### CW2

57.     CW2 worked as a regional sales manager at SolarEdge for five years, from August 2018 to March 2023. CW2 mainly ran sales in various parts of North America, mostly in different areas in Canada, the Northeast United States, and the Caribbean. Despite being based out of the United States, CW2 would interact with SolarEdge sales executives from Europe at various Company functions and meetings, such as "big sales week parties" in which SolarEdge would bring "all the top people to Israel," which gave CW2 the opportunity to "interact with counterparts in regions" outside the North America region. CW2 met regional directors and sales managers from Europe, including the Europe General Manager Alfred Karlstetter ("Karlstetter").

### CW3

58.     CW3 worked for SolarEdge as an executive assistant for one year, from August 2021 to August 2022. He worked in Milpitas under Vice President North America Sales/General Manager – Solar Business Unit Amir Cohen ("Cohen"), who reported to Matthews. CW3's

responsibilities included working for the entire sales team, participating in sales calls, taking notes, and capturing "action items." CW3 would then coordinate follow-up tasks from the sales calls and handled various other administrative assignments.

### CW4

59.     CW4 worked for SolarEdge for approximately eight years, from May 2015 until December 2023, working in various roles over that time. These roles included as a Commercial Sales Manager from May 2015 until January 2017, as the Company's Director of National Sales – Commercial and Industrial Division ("C&I") from January 2017 until May 2021, and as the Senior Director of National Sales – C&I from May 2021 until December 2023. In his various roles, CW4 worked near Washington, D.C., and reported both directly to Cohen, as well as to SolarEdge's headquarters in Israel via "dotted line." CW4 stated that he took direction directly from Defendant Lando; Chief Revenue Officer Daniel Huber ("Huber"); Vice President – Global Sales Alon Barel ("Barel"); and Vice President and General Manager – Commercial Business Unit Naama Ohana ("Ohana"), as well as others on the executive team. CW4 would interact directly with Matthews, Cohen, and Ohana to discuss forecasting. Ohana would report to Huber, who reported directly to Defendant Lando. While working as Director of National Sales, CW4 would target Distributors like engineering firms; engineering, procurement and construction firms; electrical contractors; operations and maintenance providers; financiers and project owners.

### CW5

60.     CW5 worked for SolarEdge for approximately eight years as a Sales and Operations Associate – Strategic Accounts/Account Management from March 2015 until October 2023. CW5 worked out of Milpitas and reported to Operations Senior Manager, Sales Monica Gabel ("Gabel") and to Sales and Operations Associate Lead Carolyn Springer ("Springer"), both of whom reported

to Kringel. CW5 would work directly with Distributors to manage their backlog, including outstanding shipments, and regularly held meetings with multiple Distributors to discuss their backlog. CW5 stated that he generated backlog reports every day for the Distributors within the United States, and he and his teammates would always be aware of the backlog status. These backlog reports contained orders and shipping dates, and were reviewed by Kringel.

### CW6

61.     CW6 worked for SolarEdge for approximately six years as a Senior C&I Sales Manager, Eastern North America and Director C&I Sales, North America, from August 2017 until October 2023. CW6 worked in New York City and reported to CW4. Like CW4, CW6 would also attend meetings among sales personnel from Israel. CW6 stated that Karlsetter oversaw SolarEdge's European business, and that the Company would host Karlsetter, CW6, and all the Company's sales staff in Israel for an annual "global sales week" each January.

### CW7

62.     CW7 worked for SolarEdge for approximately two years as a Senior Inside Sales Manager in Milpitas from February 2021 to December 2023. CW7 originally reporter to Cohen, and later he would report to Vice President of Sales Nick Alex ("Alex"). Alex would then report to Cohen. CW7 worked with Distributors within the United States and helped manage a team of sales representatives.

### CW8

63.     CW8 started with SolarEdge as a Contact Center Manager for North America in June 2015, overseeing a team of eight employees. CW8 then saw his role "quickly evolve[]" to include global processes, and he was promoted to Director of Customer Support in 2018 or 2019, where he now oversaw the work of 200 employees. CW8 originally worked in Milpitas before

moving to Lexington, Kentucky. CW8 would report to Vice President of Customer Success Martin Rogers, who reported to Cohen and Matthews. CW8 implemented a number of policies and processes for North America, which he claims impressed Company leadership in Israel. In his role, CW8 would travel to various locations, including SolarEdge global call centers in Munich, Germany and Melbourne, Australia, to help streamline processes and implement customer relationship management ("CRM") software. The Company originally used Salesforce for the CRM software before developing its own open-source CRM using an open-source application programming interface called SuiteCRM. CW8 also assisted in developing a new application, the "Set" app, which was an "installer commissioning tool to help streamline the process for installing."

### CW9

64.     CW9 worked for SolarEdge customer and Distributor CED Greentech Bakersfield ("Greentech") for approximately seven years from December 2015 until November 2022 as an operations manager out of Greentech's Bakersfield, California branch. In his role as operations manager, CW9 was "mainly in charge of processing," but also held some sales responsibilities.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as officers, directors, and/or fiduciaries of SolarEdge, and because of their ability to control the business and corporate affairs of SolarEdge, the Individual Defendants owed SolarEdge and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SolarEdge in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SolarEdge and its shareholders so as to benefit all shareholders equally.

66.     Each director and officer of the Company owes to SolarEdge and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SolarEdge, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

68.     To discharge their duties, the officers and directors of SolarEdge were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of SolarEdge, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

70.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings,

internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

71.     To discharge their duties, the officers and directors of SolarEdge were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SolarEdge were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SolarEdge's own Employee Code of Conduct (the "Employee Code of Conduct") and Code of Business Conduct and Ethics for Members of the Board of Directors (the "Director Code of Conduct") (collectively, the "Codes of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how SolarEdge conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of SolarEdge and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SolarEdge operations would comply with all applicable laws and SolarEdge financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to SolarEdge and the shareholders the duty of loyalty requiring that each favor SolarEdge interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SolarEdge and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, and directorial positions with SolarEdge, each of the Individual Defendants had access to adverse, non-public information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SolarEdge.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

77.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

78.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of SolarEdge was a direct,

necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

79.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

80.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of SolarEdge, and was at all times acting within the course and scope of such agency.

## SOLAREDGE'S CODES OF CONDUCT AND CORPORATE GOVERNANCE

### *Employee Code of Conduct*

81.     The Company's Employee Code of Conduct applies to all "officers and employees" of the Company and its "subsidiaries . . . and service providers offering services that are similar in nature to employee services."

82.     The Employee Code of Conduct provides:

Employees are responsible for adhering to the standards in this Code, for raising questions if they are in doubt about the best course of action and for reporting possible misconduct promptly after it comes to their attention. The Company's General Counsel is responsible for interpreting and applying this Code.

Unless a particular provision of this Code directs otherwise, if an employee is in doubt about the propriety of any action, he or she should discuss it with a supervisor, manager, or the General Counsel.  An employee who becomes aware of any conduct that he or she believes may violate this Code or any applicable law is expected to promptly report it to a supervisor, manager, or the General Counsel. Contact information for the General Counsel is below.

83.     In a section titled "Compliance with Laws," the Employee Code of Conduct provides:

> It is the Company's policy to comply with all laws, rules, regulations, and Company policies. It is the personal responsibility of employees to adhere honestly and in good faith to the standards and restrictions imposed by those laws, rules, regulations, and Company policies. Although no employee is expected to know the details of all these laws, rules, and regulations, it is important for employees to have a general understanding of the specific laws, rules and regulations that are relevant to their areas of responsibility at the Company. Employees should contact the General Counsel if they have questions about particular legal requirements or what the law permits.

84.     In a section titled "Fair Dealing and Integrity," the Employee Code of Conduct provides:

> Employees are responsible for the integrity and consequences of their actions. Employees are expected to strive to attain the highest level of personal performance and productivity and should treat one another with respect and courtesy. ***All employees are required to deal honestly, ethically, and fairly at all times with their*** fellow employees, ***customers***, suppliers, competitors, local communities and other third parties.
>
> The Company seeks to obtain competitive advantages through superior performance, never through unethical or illegal business practices. ***Employees should not take unfair advantage of anyone through manipulation, exaggeration, concealment, misrepresentation of facts, abuse of confidential or privileged information or like practices***.

85.     In a section titled "Insider Trading," the Employee Code of Conduct provides:

> Federal and state laws prohibit buying, selling, or making other transfers of securities by persons who have material nonpublic information about a company. Even if not shareholders, these laws prohibit persons with this information from disclosing it to others who may trade. "Material information" generally means information that there is a likelihood a reasonable investor would consider important in deciding whether to buy, hold or sell securities. "Nonpublic information" is information that is not generally known or available to the public. Insider trading is a crime punishable by civil penalties, criminal fines and prison. Companies may also face civil penalties for insider trading violations by their employees and other agents.
>
> Employees may not trade in the securities of any company when they are aware of material nonpublic information about that company. This policy against "insider

trading" applies to trading in Company securities, as well as to trading in the securities of other companies, such as the Company's customers, distributors, suppliers, and companies with which the Company may be negotiating a major transaction. In addition, employees may not convey material nonpublic information about the Company or another company to others or suggest that anyone purchase or sell any company's securities while they are aware of material nonpublic information about that company. This practice, known as "tipping," may violate the securities laws and may result in the same civil and criminal penalties that apply to engaging in insider trading directly, even if the employee does not receive any money or derive any benefit from trades made by persons to whom the employee passed material nonpublic information.

86.     In a section titled "Maintaining Books and Records and Public Reporting," the

Employee Code of Conduct provides:

Employees are expected to maintain books and records in appropriate detail to reflect the Company's transactions accurately, fairly, and completely. ***The Company's policy of accurate, fair and complete recordkeeping applies to all Company records***. Documentation relating to a transaction should fully and accurately describe the nature of the transaction.

As a public company, the Company files financial statements and other information with the U.S. Securities and Exchange Commission ("SEC"). Employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and non-financial information that may be material to the Company. ***Reports and other documents that the Company files with or submits to the SEC, and other public communications, should contain full, fair, accurate, timely and understandable disclosure***.

87.     In a section titled "Waivers," the Employee Code of Conduct provides:

Waivers of certain provisions of this Code will be granted only in exceptional circumstances. Employees who believe that a situation may warrant a waiver should contact the General Counsel. Any waivers of provisions of this Code for executive officers of this Company will be made via request to, and approved only by, the Board of Directors of the Company (or Committee thereof) and will be disclosed in accordance with applicable law.

***Director Code of Conduct***

88.     The Company's Director Code of Conduct applies to all directors of the Company.

The Director Code of Conduct states that its purpose:

[I]s intended to focus the Board and each director on areas of ethical risk, provide guidance to directors to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, and help foster a culture of honesty and accountability.  Each director must comply with the letter and spirit of this Code.

No code or policy can anticipate every situation that may arise.  Accordingly, this Code is intended to serve as a source of guiding principles for directors.  Directors are encouraged to bring questions about particular circumstances that may implicate one or more of the provisions of this Code to the attention of the Chairman of the Audit Committee, who may consult with inside or outside legal counsel, as appropriate.

Directors who also serve as officers of the Company should read this Code in conjunction with the Company's Employee Code of Conduct.

89.     In a section titled "Director Responsibilities," the Director Code of Conduct

provides:

The board represents the interests of stockholders, as owners of a corporation, in optimizing long-term value by overseeing management performance on the stockholders' behalf.  The board's responsibilities in performing this oversight function include a duty of care and a duty of loyalty.

A director's duty of care refers to the responsibility to exercise appropriate diligence in overseeing the management of a corporation, making decisions and taking other actions.  In meeting the duty of care, directors are expected to:

- *Attend and participate in Board and committee meetings*.  Personal participation is required.  Directors may not vote or participate by proxy.

- *Remain properly informed about the corporation's business and affairs*. Directors should review and devote appropriate time to studying Board materials.

- *Rely on others*.  Absent knowledge that makes reliance unwarranted, directors may rely on Board committees, management, employees, and professional advisors.

- *Make inquiries*.  Directors should make inquiries about potential problems that come to their attention and follow up until they are reasonably satisfied that management is addressing them appropriately.

A director's duty of loyalty refers to the responsibility to act in good faith and in the best interests of the corporation and its stockholders, not the interests of the director, a family member or an organization with which the director is affiliated.  Directors should not use their positions for personal gain.  The duty

of loyalty may be relevant in cases of conflict of interest (section 2 below), and corporate opportunities (section 3 below).

(Emphasis in original).

90.     In a section titled "Compliance with Laws, rules and regulations; fair dealing" the

Director Code of Conduct provides:

> Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company, including insider trading laws.  Transactions in Company securities are governed by the Company's Insider Trading Policy.
>
> Directors shall oversee fair dealing by employees and officers with the Company's customers, suppliers, competitors and employees.

91.     In a section titled "Compliance procedures; waivers," the Director Code of Conduct

provides:

> Directors should communicate any suspected violations of this Code promptly to the Chairman of the Board or the Chairman of the Audit Committee. Violations will be investigated by the Board or by a person or persons designated by the Board and appropriate action will be taken in the event of any violations of the Code.
>
> Any waivers of this Code may only be granted by the Board or the Audit Committee after disclosure of all material facts by the director seeking the waiver.  Waivers will only be granted in exigent circumstances and will be disclosed promptly to stockholders.

### *Principles of Corporate Governance*

92.     SolarEdge has also adopted Principles of Corporate Governance (the "Principles").

The Principles are intended to serve "as a framework for the governance of the Company."

93.     In a section titled "Role of the Board," the Principles provide:

> The Board of Directors, which is elected by the Company's stockholders, oversees the management of the Company and its business. The Board selects executive officers, which are responsible for operating the Company's business, and monitors the performance of the executive officers. Consistent with the oversight function of the Board, the Board's core responsibilities include:

• Assessing the performance of the Chief Executive Officer (the "CEO") and other executive officers and setting their compensation;

• Planning for CEO succession and overseeing the development of executive officers;

• Reviewing the Company's strategies and monitoring their implementation and results;

• Overseeing the integrity of the Company's financial statements and the Company's financial reporting process;

• Overseeing the Company's processes for assessing and managing risk;

• Overseeing legal and regulatory compliance;

• Nominating the Company's director candidates and appointing committee members; and

• Providing advice and counsel to management regarding significant issues facing the Company and reviewing and approving significant corporate actions.

94.     In a section titled "Strategic Planning," the Principles state that "[t]he Board reviews the Company's long-term strategic plan at least annually ***and monitors implementation of the strategic plan throughout the year***."

95.     In a section titled "Formal Evaluation of the CEO," the Principals provide:

The Compensation Committee is responsible for setting annual and long-term performance goals for the CEO, evaluating the CEO's performance against those goals, and recommending the CEO's compensation to the independent directors for approval. Both the goals and the evaluation are submitted for consideration by the independent directors meeting in executive session. The results of the evaluation are shared with the CEO and used by the Compensation Committee in considering the CEO's compensation, which is approved by the independent directors meeting in executive session.

96.     In a section titled "Board and Committee Performance Evaluations," the Principles provide:

The Board conducts an annual self-evaluation to assess its performance. The Audit, Nominating/Corporate Governance and Compensation Committees conduct annual self-  evaluations   to   assess   their   performance.   In   addition,   the

Nominating/Corporate Governance Committee is responsible for conducting an annual evaluation of the performance of each director.

The Nominating/Corporate Governance Committee is responsible for developing, administering and overseeing processes for conducting evaluations.

97. In violation of the Codes of Conduct and the Principles, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' schemes to engage in the Unneeded Product Misconduct, to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Employee Code of Conduct by engaging in insider trading, netting proceeds of approximately $16,710. Also, in violation of Codes of Conduct and the Principles, the Individual Defendants failed to maintain the accuracy of SolarEdge's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

### *Audit Committee Charter*

98. SolarEdge's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

99. The Audit Committee Charter states that the purpose of the Audit Committee is to:

• represent and assist the Board of Directors in discharging its oversight responsibility relating to: (i) the accounting and financial reporting processes of the Company and its subsidiaries, including the audits of the Company's financial statements and the integrity of the financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the outside auditor's qualifications, independence and performance; and (iv) the design, implementation and performance of the Company's internal audit function; and • oversee preparation of the report required by the rules of the SEC to be included in the Company's annual proxy statement.

• Meet periodically with outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company;

100.    The Audit Committee Charter lists the responsibilities of the Audit Committee, in

relevant part:

• Be directly responsible, in its capacity as a committee of the Board, for the appointment, compensation, retention and oversight of the work of the outside auditor. In this regard, the Audit Committee will appoint and retain (subject to ratification by the Company's stockholders), compensate, evaluate, and terminate when appropriate, the outside auditor, which will report directly to the Audit Committee.

• Oversee implementation of new accounting standards by having the outside auditor's report on a quarterly basis on accounting standards that could impact the Company's business.

• Meet to review and discuss with management and the outside auditor the annual audited and quarterly financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the independent auditor's reports related to the financial statements.

• Recommend to the Board based on the review and discussion described in [the] paragraphs [] above, whether the financial statements should be included in the Annual Report on Form 10-K.

• Receive reports from the outside auditor and management regarding, and review and discuss the adequacy and effectiveness of, the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Audit Committee by the outside auditor or management.

• Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

• Review and discuss with the principal internal auditor of the Company: (1) the annual audit plan and the adequacy of internal audit resources; and (2) the results of the internal audit program.

• Annually review and discuss the performance and effectiveness of the internal audit function.

- Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

- Review and discuss the Company's practices with respect to risk assessment and risk management.

- Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the general counsel, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

- Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and the Company's policies and procedures for monitoring compliance; and at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the general counsel, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

- Assess the Company's risk management survey and the underlying internal audit plan.

- Annually evaluate the performance of the Audit Committee and assess the adequacy of the Audit Committee charter.

101. In violation of the Audit Committee Charter, Defendants Gani, Gross, and Payne failed to adequately review and assess the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions, including as each related to the Unneeded Product Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Codes of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

### *SolarEdge's History and Business*

102.    SolarEdge was incorporated in Delaware in 2006 as a solar energy company that designs, produces, and markets DC optimized inverter solutions for PV systems. While SolarEdge initially started by targeting the residential markets, the Company has since expanded into the commercial market, and now even the utility-scale market. In addition to inverters, SolarEdge also now sells smart energy technology, which allows for energy storage and e-mobility.

103.    The PV systems that SolarEdge markets contain two components: modules, which are the part of the solar panels that capture energy from the sun, and inverters. The purpose of an inverter is to convert DC power into alternating current ("AC") power, as most homes, generation plants, and the electric grid are wired to operate under AC. SolarEdge operates its business through two segments: "Solar" and "All Other." The Solar segment focuses on the development, production, and sales of an inverter solution that is intended to maximize power generation, while the All Other segment focuses on the development, production, and sales of other products, including energy storage, e-Mobility, and automated machines.

104.    SolarEdge's business is split into three geographic regions: The United States, Europe, and the ROW. Of the three, the majority of SolarEdge's revenue derives from Europe. Europe accounted for 54.3% of SolarEdge revenue in the 2022 Fiscal Year, with that share increasing to 64% in the 2023 Fiscal Year.

### **The Unneeded Product Misconduct**

### *Background on SolarEdge's Revenue and Inventory Calculations*

105.    SolarEdge mainly sells its products to intermediaries such as distributors, electrical equipment wholesalers, and large installers within the industry. The Distributors then sell SolarEdge products down the supply chain to end users such as installers and engineering,

procurement, and construction firms. When selling its products, SolarEdge claims that they are "fully functional at the time of shipment to the customer" and therefore "do not require production, modification, or customization." However, despite being at the top of the supply chain, SolarEdge recognizes its revenue upon Distributors receiving products, as opposed to when the Distributors sell the products through to end users. As such, the Company's revenues are dependent on how much product its Distributors take, and not the amount of product that its Distributors are actually selling or installing.

106.    When disclosing its inventory within SEC filings, the Company only discloses the inventory it holds itself, and not the amount of Channel Inventory that its Distributors hold that has not yet been sold through. As such, the filings solely show SolarEdge's inventories as "raw materials," "work in progress," and "Finished Goods Inventory." At the end of 2022, the Company reported that it held $729 million in inventories, $203 million of which was finished goods.

107.    At the start of the Relevant Period, the CWs claim that demand for Company products in Europe had begun to decline, while the Channel Inventory levels began to rise. In order to ensure the Company hit its revenue targets, employees of the Company were encouraged to commit the Unneeded Product Misconduct, in which they were instructed to force Distributors to take on more product.

### *Distributors Began to Be Forced to Take Goods*

108.    In the Securities Class Action, the CWs revealed their experiences in both observing the scheme, as well as being forced to take part. One example is CW2, who stated that as early as early 2023 he had begun to hear rumblings that regarding "concerns and discussions that Europe wasn't going well." Among those taking part in these discussions were his sales colleagues, along with members of SolarEdge's upper management in North America (including

Cohen and Matthews). CW2 also saw SolarEdge inventories begin to rise starting in 2022 and into 2023, which he claims "struck me as ominous." According to CW2, the growing inventories were spun as a "good thing" because it meant that the Company was "not constrained." However, CW2 felt that the rise in inventories was "indicative" of the Company "sandbagging," or forcing Distributors to take product early so that SolarEdge could "make numbers," and that "some numbers in quarterly reports were the result of them pulling revenue in rather than organic growth." CW2 also felt that the reported decreased demand in 2023 was a result of the "sandbagging" that was finally backfiring on the Company because Distributors were unable to take any additional product.

109.   CW2 also mentioned how, on multiple occasions, he witnessed SolarEdge "force[] Distributors to take delivery on product early, and that saddled Distributors with large inventories." One method that CW2 described as to how SolarEdge forced product on Distributors was that there were "times when orders for delivery would literally go out prematurely before they were scheduled to go out." Upon a Distributor calling to tell SolarEdge of the receipt of the early shipment, CW2 claimed that the response was "[o]h, we accidentally shipped this. But hey, we'll extend your terms." According to CW2, this happened frequently to Distributor Greentech. And, because the Company recognized orders for products as revenue when equipment was "shipped under terms to a direct customer or distributor," the shipments would be recorded within the quarter that they were shipped, even if the money itself is not received until much later. Per CW2, these early shipments "only went one way," and always "happened near the end of the quarter."

110.   CW4 was also witness to SolarEdge forcing its product on Distributors. CW4 described how the Company "did not like to cancel orders" and held a policy that "did not allow Distributors to cancel orders." Among other companies in the solar industry, CW4 said SolarEdge

is "definitely on the more aggressive side and was not very customer-centric and certainly not distribution-friendly." Per things he heard in meetings, CW4 described Distributors wanting to cancel and push out orders in the residential market, and how "it would turn into a battle" between the Company and Distributors. Echoing CW2, CW4 stated that, as a policy, Solar Edge recognized revenue "when an order was placed" and "when it came to the end of the quarter. If we had the product built, it got out the door."

111.    CW4 also identified another method SolarEdge would use to encourage Distributors to take unneeded product. According to CW4, at the end of a financial quarter he would get "hounded" by his supervisors to get Distributors to agree to "free carrier shipping terms, allowing SolarEdge to transfer the ownership of the orders (and therefore recognize the orders as revenue) at a "point of origin," or the manufacturing location, even if the items had not even been received by Distributors. Backing up this claim, CW5 recalled that in the first and second quarters of the 2023 Fiscal Year, he noticed that SolarEdge had started to request Distributors change orders to "FOB origin," meaning that upon SolarEdge shipping the product, the Distributors owned it. Under this method of forcing product on Distributors, CW4 claimed that the Company was recognizing revenue before the orders had even shipped, and these requests came towards the end of the financial quarter to recognize revenue and meet targets.

112.    In explaining how the policy was discussed among higher level employees at the Company, CW7 mentioned "directors' meetings" that he personally attended. These meetings were typically held weekly from 11 a.m. to 12:30 p.m. in Milpitas and would be attended by Cohen, Alex, Matthews, and five other directors. CW7 believed that what was discussed in the meetings were eventually communicated to Defendant Lando, who (according to CW7) knew of the practice of forcing equipment upon Distributors. CW8 also recalled similar discussions he had had with

Matthews, Kringel, Cohen, Alex, and Vice President of Customer Success Martin Roger. As to where the orders originated, CW8 felt he was "sure it was coming from Lando or the top of the Company," referencing Defendant Lando's history as the Vice President of Sales prior to becoming the CEO, and therefore being involved with the Company's Sales Strategy.

113.     Even more, per CW4, the Company was "very aggressive" in its financial predictions and goals for sales through to end customers (as opposed to sales simply to Distributors). CW4 would create predictions on his own based on "market reports," from analysts such as IHS Markit, Wood Mackenzie and an "up-and-coming" firm called Ohm Analytics, in addition to the Company's historical data. However, SolarEdge leaders, including Matthews, Cohen, Ohana, and Huber, would inform CW4 that his "numbers are too low," even when CW4 stated he was "not going any higher." Despite CW4's insistence, Matthews, Cohen, Ohana, and Huber would adopt forecasts that were too high.

114.     CW5 began to see Distributors attempting to cancel orders as early in the Relevant Period as February 2023 because their inventories were becoming oversaturated. The attempts to cancel orders continued until at least CW5 left SolarEdge in October 2023. CW5 recalled how "[p]eople were wanting to cancel stuff, and we were telling people per the contract, it was too late to cancel . . . we were moving numerous orders to different quarters because we wouldn't let them cancel." It was getting to a point with Distributors that CW7 remembers a time when an employee of Greentech started screaming at him because "SolarEdge was shoving product down his throat."

115.     Describing what it was like from the Distributor side, CW9 recalled SolarEdge regularly asking Greentech to take product towards the end of quarters. The amount of product he would be asked to take would vary based on the quarter, but Greentech almost always ended up

taking SolarEdge products. Even when he would tell SolarEdge he didn't need the products yet, the reply would be something along the lines of, "well, it would really help us out."

116.    Eventually, this policy caught up to SolarEdge. When analyzing the declines in the third quarter of the 2023 Fiscal Year, CW6 felt that forcing Distributors to take product was the direct cause. CW6 stated it simply, as "[w]hen you treat people poorly and it comes time when they can help you or hurt you, what happens?"

### *The Individual Defendants Knew, or Should Have Known, About How Forcing Distributors to Take Product Impacted Inventory Levels and Distributor Demand*

117.    The Individual Defendants knew, or at the very least should have known, that the Unneeded Product Misconduct would ultimately have an adverse impact on the Company's financial results. Both CW1 and CW2 discussed how Defendant Lando was "intimately involved" in the Company's business operations. CW2 claimed that Defendant Lando's attention to detail was part of the reason he was selected to be the Company's CEO, as he was "thought to be the person that understood" the Company best.

118.    When tracking the Company's backlog and inventory, CW1, CW2, and CW5 all identified that SolarEdge uses an Israeli-made resource planning software called "Priority." Priority was able to show vendors, points of contact, and full order details, including monetary amounts, specific products, and couriers used to make deliveries. CW1 had even personally accessed the system, and stated that Defendant Lando and other senior leaders of SolarEdge would receive consistent reports from the Priority system.

119.    In addition to the reports from the Priority system, CW2 claimed that Defendant Lando and senior leadership of SolarEdge also received daily inventory reports, as they were considered "one of the basic metrics" for "assessing" the Company's business. These inventory reports contained not just the Company's inventory, but also the Channel Inventory, with an

additional metric ("Days on Hand") that showed how much time it would take a Distributor to sell through all their inventory. In addition to these inventory reports, according to CW2 the channel Distributors also had to provide the Company with regular reports with data on current inventory and point of sale. The requirement for such reports was included in the master service agreements ("MSAs") between the Company and its Distributors. According to CW2, these reports were "one of the primary ways of understanding" the Company's business, and that it "would indicate criminal negligence" if Defendant Lando and senior leadership were not receiving these reports. CW4 claimed that he knew Defendants Lando and Faier were aware of the content of the reports because when he would ask his supervisor for a certain product, his supervisors would reply that Defendants Lando and Faier would question CW4's need for the products given that certain Distributors already had those products and he would be able to get the products from them.

120.    To ensure that SolarEdge actually received the reports from its Distributors, CW4 claimed that the Company would "leverage" a "special pricing agreement" ("SPA") process where SolarEdge "gave back-end rebates to Distributors based upon agreed upon pricing with the end customer." Under the SPAs, the only way Distributors get these rebates is if they sent the Company the point-of-sale reports.

121.    Regarding the region-based business, CW8 detailed weekly meetings that Karlstetter had with Defendants Lando and Faier. CW8 also made mention of Quarterly Business Review ("QBRs") Karlstetter had with Defendants Lando and Faier. According to CW8, these meetings provided inventory and Channel Inventory updates, as well as forecasting updates. QBRs were held with each region in the Company. According to CW3, Matthews and Cohen participated in the North American QBRs, with Defendants Lando and Faier traveling to California for these meetings, "along with a few other C-level people."

122.    Within the QBRs, CW3 stated that Company leadership "would share all the financial details, where [SolarEdge] is going each quarter, what are the targets, how much are they met, what is expected, what they can provide to achieve their expectations." PowerPoint presentations would be used to communicate these details, highlight earnings, projections, and volumes of product sold. CW4 claimed the QBRs would be held approximately at the same time as the quarterly earnings calls, as Defendants Lando and Faier "would like to be in North America to present to Wall Street."

123.    According to CW1, CW2, and CW3, a final report that the Company received was inventory reports through "Qlik Sense" software, which identified inventory coming in, going out, and current manufacturing volume.

124.    During multiple QBRs in the first half of 2023, CW4 directly informed Defendants Lando and Faier, as well as Matthew, Cohen, Ohana, and Huber, that demand was falling and "the market was a lot worse than they thought."  However, CW said, "all they wanted to hear was" why SolarEdge was "not shipping more." Regarding the rising inventories during the first half of 2023, Company executives began asking "how come nobody's taking the product?" To which CW4 replied "because I told you they don't need it."

### False and Misleading Statements

### *February 13, 2023 Earnings Call*

125.    On February 13, 2023, after the market closed, the Company hosted the FY 2022 Earnings Call. On the call, Defendant Lando touted that SolarEdge "***concluded the quarter with record revenues*** of $890 million and record revenues for the year 2022 of $3.1 billion." This was a sentiment that was repeated throughout the call, with Defendant Lando repeating at one point: "[t]his quarter, we generated ***record revenues for the company, led by record revenues from our***

*global solar business driven from significant quarter-over-quarter growth in the United States*." Defendant Lando continued by stating that "[a] key highlight of 2022 was the growth of our revenues from Europe, which grew by 89% year over year." In explaining the surge in revenue growth in Europe, Defendant Lando explained it as: "*the increase in power prices prior to the beginning of the Ukraine-Russia conflict and the accelerated increases ever since, as well as the expansion of our portfolio to include inverters, EV chargers, and batteries, addressing the specific European needs*."

126.    In regard to the demand and inventory in Europe, Defendant Lando stated "[f]rom a demand and inventory point of view, *we continue to see very strong demand from Europe for all products and relatively low inventory levels in the channel*." In response to a question from an analyst regarding expectations for growth in Europe, Defendant Lando responded that "in many cases, we see that the demand is far exceeding our ability to manufacture and deliver." And, in response to a separate question in regards to expecting a slowdown in demand, Defendant Lando responded:

> *[T]o a large extent, our 2023 in Europe will be similar to the condition we were in in 2022, which is more dependent on our ability to produce the volumes than the demand*. I can give you an indicator which is true for the company as a whole, but it's most pronounced in Europe, that our current backlog for 2023 is well above what we delivered in 2022 globally and in particular, in Europe. So, *as far as we can see, the market is – the demand is good, and the market is strong, and we are ramping production to meet demand*."

127.    Regarding the weaknesses among the United States residential market, Defendant Faier informed investors that weaknesses in the United States would be more than accounted for by "*the demand that we see in Europe and the rest of the world*," and therefore, "the deviation between the U.S. or Europe is not very much impacting our guidance at this point."

128.    The statements made on the FY 2022 Earnings Call prompted optimism from investors, with the Company's share price rising significantly over two trading days, from a close price of $310.71 on February 13, 2023, to a close price of $343.98 on February 15, 2023, an increase of 10.7%.

**March 13, 2023 ROTH Conference**

129.    On March 13, 2023, Defendant Danziger participated in a talk on behalf of the Company at the 35th Annual ROTH Conference ("ROTH Conference"). In his discussions with analysts, Defendant Danizger, speaking on the Company's behalf, highlighted expectations for the Company's performance in the 2023 Fiscal Year, stating: "***it's definitely the case that [Europe] will probably be the fastest-growing geographies for us . . . We're definitely looking ahead toward a very healthy and robust year in Europe again***." This was a sentiment that Defendant Danziger emphasized throughout the conference, later repeating that "***we're expecting extremely healthy and robust demand in Europe***."

130.    In explaining his position, Defendant Danziger identified that prior sales had been negatively impacted by supply chain obstacles, and that the second half of the 2023 Fiscal Year would therefore be stronger, stating: "***we're working very hard on solving those couple of bottlenecks we have to solve. And then we can probably – and I would say somewhere towards the second half of the year, we should expect some relief coming***."

**March 28, 2023 Wells Fargo Symposium**

131.    On March 28, 2023, Defendant Faier took part in an interview with an analyst while attending the Wells Fargo Energy Symposium (the "Wells Fargo Symposium"). In response to an analyst question regarding a backlog in Europe and where things stand in that market, Defendant Faier responded, "the situation is that . . . ***the demand is – continues to be very strong***. And I think

that today, *most dynamics are related to the – more to the ability to supply rather than the demand*." Defendant Faier continued by stating the "booming" demand in Europe could be attributed to "*the combination of relatively low interest rate environment . . . plus the fact that electricity prices hiked*."

132.    Regarding Channel Inventory, Defendant Faier assured analysts that inventory was low in Europe. Defendant Faier even went so far as to state that "*when we are looking at the inventory on hand, when it comes to our distributors, the channels are pretty, I would say, low on inventory in most cases*."

### April 21, 2023 Proxy Statement

133.    On April 21, 2023, the Company filed its annual proxy statement filed on Schedule 14A with the SEC (the "2023 Proxy Statement"). The 2023 Proxy Statement was solicited by Defendants Lando, Zafrir, Atkins, Gani, Hoke, More, and Payne pursuant to Section 14(a) of the Exchange Act and contained various false and misleading statements and omissions.

134.    The 2023 Proxy Statement called for shareholders to approve, *inter alia*: (1) the reelection of Defendants Gani and Payne to the Board; (2) the ratification of Ernst & Young LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) executive compensation, on an advisory basis; (4) the frequency of executive compensation votes, on an advisory basis; (5) to amend the Certificate of Incorporation to declassify the Board and phase in annual elections; (6) to amend the Certificate of Incorporation to remove a supermajority voting requirement for future amendments to the Certificate of Incorporation and bylaws; and (7) to amend the Certificate of Incorporation to add a federal forum selection provision for causes of action that arise under the Securities Act of 1933.

135.    Regarding the Board's role in Risk Oversight, the 2023 Proxy Statement stated the

following, in relevant part:

> The Board of Directors oversees the Company's risk management process both directly and through its committees, the Audit Committee and the Technology Committee. The Board oversees a Company-wide approach to risk management, designed to enhance stockholder value, support the achievement of strategic objectives and improve long-term organizational performance. The Board continuously reviews the Company's progress against its annual strategic plans and determines the appropriate level of risk for the Company generally, assesses the specific risks faced by the Company and reviews the steps taken by management to manage those risks. The Board's involvement in setting the Company's business strategy facilitates these assessments and reviews, culminating in the development of a strategy that reflects both the Board's and management's consensus as to appropriate levels of risk and the appropriate measures to manage those risks. Pursuant to this structure, risk is assessed throughout the enterprise, focusing on risks arising out of various aspects of the Company's strategy and the implementation of that strategy, including financial, legal/compliance, operational/strategic, health and safety, cyber security, ESG matters, human capital management and compensation risks. The Board also considers risk when evaluating proposed transactions and other matters presented to the Board, including material acquisitions and financial matters. Other risks assessed by the Board of Directors or one of its designated committees arise out of the audit performed by the Company's internal audit team. The Company's internal auditor performs a risk assessment and based on these results, established a strategy for audits. The results of these audits are reported to the Audit Committee and often times, when business risks are identified, the Board of Directors or a designated committee continues to receive follow up on the matters at hand.

> **ESG Strategy and Oversight** As part of the Board's risk oversight, the Board receives quarterly reports on key ESG matters and progress of the Company's attainment of its ESG goals. The Board has delegated the overall oversight for the Company's sustainability performance, disclosure, strategies, goals and objectives as well as monitoring evolving sustainability risks and opportunities to the Company's Nominating and Corporate Governance Committee. The Board has delegated the overall oversight for the Company's human capital management, including with respect to matters such as diversity and inclusion to the Compensation Committee.

> In 2021, the Board formally expanded the charter of the Nominating and Corporate Governance Committee to reflect its responsibility over the Company's sustainability matters, and the Compensation Committee's charter was expanded to include its responsibility over human capital management.

***

**Risk Oversight** While the Board maintains the ultimate oversight responsibility for the risk management process, its committees oversee risk in certain specified areas. In particular, the Audit Committee reviews and discusses the Company's practices with respect to risk assessment and risk management. The Audit Committee also focuses on the adequacy and effectiveness of the Company's internal controls. In 2019, the Company appointed a Senior Director of Risk Management and Internal Audit and in 2021 further expanded its internal audit team in order to support audit continuity by a function that is deeply acquainted with the Company. The Audit Committee receives regular reports from the Company's Senior Director of Risk Management and Internal Audit on the Company's internal system of audit and financial controls, enterprise risk information, and the periodic report of internal audit activities. The annual internal audit work plan is created based on a comprehensive risk assessment survey and is approved by the Audit Committee. In addition, the Audit Committee oversees the Company's compliance program with respect to legal and regulatory requirements, including the Company's codes of conduct and policies and procedures for monitoring compliance. The Compensation Committee oversees the assessment of the risks related to the Company's compensation policies and programs applicable to its officers and other employees. Management regularly reports on applicable risks to the relevant committee or the Board, as appropriate, including reports on significant Company projects, with additional review or reporting on risks being conducted as needed or as requested by the Board and its committees.

(Emphasis in original).

136.    With respect to the Codes of Conduct, the 2023 Proxy Statement stated the

following:

We have adopted a code of business conduct and ethics that applies to all of our officers and employees, including our Chief Executive Officer and Chief Financial Officer and those officers and employees responsible for financial reporting. We have also adopted a code of business conduct and ethics that applies to our directors. Our codes of business conduct and ethics are posted on the investor relations section of our website.

Recent additions to the codes of business conduct and ethics include expanded details on whistleblower mechanisms; a commitment on human rights protection; and further guidance on political involvement (see details below).

In addition, we have published in 2021 a complimentary anti-corruption approach document, which provides expanded details on relayed issues. These include the definition of reasonable and unreasonable gift exchange; avoidance of conflicts regarding financial interests; guidelines for participation in external events; and additional instructions and guidelines related to anti-corruption.

The Company has also recently revised its insider trading policy, among other things to prohibit all employees and non-employee directors from engaging in any speculative transactions, hedging and pledging transactions and trading on margin.

We intend to disclose future amendments to our codes of business conduct and ethics, and any waivers of their provisions that we grant to our executive officers and directors, on our website within four business days following the date of the amendment or waiver that require disclosure under the applicable rules.

137.    The 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Codes of Conduct were not followed, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Unneeded Product Misconduct; (2) making and/or causing the Company to make the numerous false and misleading statements alleged herein; and (3) failing to report violations of the Codes of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

138.    The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe, the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls.

139.    As a result of Defendants Lando, Zafrir, Atkins, Gani, Hoke, More, and Payne causing the 2023 Proxy Statement to be false and misleading, shareholders voted to reelect Defendants Gani and Payne to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; to appoint Ernst and Young as the Company's independent registered public accounting firm for the 2023 Fiscal Year; to approve executive compensation, on an advisory basis; to vote on executive compensation annually, on an advisory basis; to amend the Certificate of Incorporation to declassify the Board and hold annual elections; to amend the Certificate of Incorporation to remove the supermajority voting requirement for future amendments to the Certificate of Incorporation and Company bylaws; and to amend the Certificate of Incorporate to add a federal forum selection provision for causes of action that arise under the Securities Act of 1933.

### May 3, 2023 Earnings Call

140.    On May 3, 2023, after the market closed, the Company hosted its investor earnings call for the first quarter of the 2023 Fiscal Year (the "1Q 2023 Earnings Call"). The 1Q 2023 Earnings call revealed more supposedly good news for investors, as Defendant Lando reported on "[r]evenues from our solar business were *at a record $909 million* . . . Mostly driven by *record revenues in Europe* and Rest of World." Defendant Lando went on to tout that "[t]he *European residential markets continues to be very strong for us in this quarter as we ramp shipments of three-phase residential inverters, in particular, our new backup inverter as well as the three phase residential battery*."

141.    As for future projections in the European market, Defendant Lando stated that "[w]e expect this momentum to continue in the coming quarters," attributing it to "*strong demand for this product*." And, in response to a question regarding inventory levels, Defendant Lando

stated that "in Europe, *we actually see low [channel] inventory days on hand,*" and "not only . . . [do] we see that the *level of [channel] inventory is relatively not high*, but it's actually that we see *record sellout of products coming from the distribution channels*." The 1Q 2023 Earnings Call also revealed guidance for second quarter earnings of between $930 million and $980 million in revenue, and gross margins of between 34% and 37% for the solar business.

142.    On the 1Q 2023 call, Defendant Faier echoed a number of Defendant Lando's statements earlier in the call, as well as statements he had made at the Wells Fargo Symposium. Specifically, Defendant Faier lauded that the "vast majority" of SolarEdge's batteries "continue to be shifted to Europe, driven by the strong adoption and demand for our three-phase solution."

143.    Defendant Faier explained the increase in the Company's inventory, which had grown from $729 million to $874 million over the quarter, an increase of 20%, with the Finished Goods Inventory increasing even more drastically, from $202 million to $303 million (a 64.4% increase). Defendant Faier attributed this growth as a "result of streamlined manufacturing," stating:

> As of March 31, our inventory level net of reserve was at a level of $874.2 million compared to $729.2 million in the prior quarter. It's important to note that *our inventory levels this quarter include higher levels of finished goods products as a result of streamlined manufacturing. This finished goods inventory in the various regions will allow us to further improve our customer delivery time and reduce shipping and logistic expenses*.

144.    Defendant Faier further reassured investors that the high level of Finished Goods Inventory was not unusual, stating:

> Over the last 2 years, we have dealt with challenges around components availability, supply chain issues and logistic constraints. The general improvement in the market combined with the actions that we have taken have allowed us to return to a more normal mode of operation. *In most product areas, we are at a point where our manufacturing capacity is able to meet demand and we can use normal shipping routes, build inventory, and reduce lead times.*

145.    In response to a Goldman Sachs analyst's question regarding rumors of a potential slowdown in Europe, Defendant Lando publicly represented to investors and analysts that there was no decrease in demand, stating, "we don't see right now a change in the pattern of demand in the market in Europe . . . [a]nd we don't see, at least until now *any change in the dynamic and the market continues to be strong*."

146.    In response to a later question from a Deutsche Bank analyst pertaining to expected growth in the upcoming second and third quarters compared to the first quarter, Defendant Lando replied that the European markets were "three-phased based," meaning that "*growth is less dependent on demand. It's more dependent on our ramp of manufacturing, which I mentioned, will take us another couple of quarters until we're at a full scale of matching the supply to demand*." And, responding to a follow-up question regarding the United States, Defendant Lando reiterated, "[*i*]*n Europe, the situation is more dependent on our supply and our intent to continue and increase the capacity of three-phase residential inverters. So the outlook is for likely growth*."

147.    As a result of these statements, the next day, on May 4, 2023, Deutsche Bank released an analyst report which upgraded the Company's stock from a "Hold" rating to a "Buy" rating, citing its business in Europe as the driving factor. The report identified that Deutsche Bank "[has been positive on [SolarEdge]'s business mix, with a diversified mix of residential vs commercial use, but also US exposure (>30%), Europe (~55%) and other international markets where we have been observing strong demand (double digits in the 40-60% range for European residential demand in our opinion)." The report further went on to identify SolarEdge's European business as a reason that it was "well-positioned in the coming quarters."

148.    The statements made on the 1Q 2023 Earnings Call prompted optimism from investors, with the Company's share price rising significantly over two trading days, from a close price of $263.82 on May 3, 2023, to a close price of $293.39 on May 5, 2023, an increase of 11.4%.

***June 21, 2023 J.P. Morgan Conference***

149.    On June 21, 2023, Defendant Danziger participated in a talk on behalf of the Company at the J.P. Morgan Energy, Power, and Renewables Conference (the "JPM Conference"). While speaking at the JPM Conference, a J.P. Morgan analyst asked Defendant Danziger about what the Company was seeing in Europe, "in light of some of the kind of – some of the third-party forecasts that have come out for some flattening in the market?" Defendant Danziger responded by rejecting the existence of any changes in demand in Europe, stating that:

> [W]hat we're still seeing and observing in Europe is not so much different than what we mentioned after our last earnings . . . ***we're still looking at very healthy demand across the board in the markets and in the segments*** . . . But overall, and including both residential and commercial, ***we're still looking at a very healthy demand in Europe. And this would probably still be the fastest-growing geographies for us in 2023.***

150.    In a follow-up question, the analyst then asked if the demand was a result of the market still growing, or more a result of additional gains in market share, new customers, or new geographies. In response, Danziger stated:

> I think it's a combination of all . . . it's still a very attractive economic investment to do to install a solar system in Europe and ***we're still seeing driving very strong demand on the residential front. On the C&I side, there's this layer of ESG-driven demand that we're seeing more and more corporations are starting to take their net zero emissions journey***. And usually, to start with the solar system is a fairly good step to start with.

151.    Danziger's statements at the JPM Conference prompted J.P. Morgan to release a report based upon their observations. The report reassured investors that "[SolarEdge] noted very healthy demand in Europe, which we believe is a positive given investor concerns over recent third-party market forecasts." Therefore, Danziger's statements clearly had the necessary illusory

effects needed to fool investors and analysts into believing that there was nothing to be concerned about regarding SolarEdge's business.

152.    The statements in ¶¶ 125-132 and 140-151 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe, the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

#### *August 1, 2023 Earnings Call*

153.    The truth began to emerge on August 1, 2023, after the market closed, when the Company hosted the 2Q 2023 Earnings Call. On the 2Q 2023 Earnings Call, with Defendant Lando finally admitting that "[t]he solar market is going through a transition, emerging from the recent period of component shortages, high energy prices, and rapid growth to one now impacted by

higher interest rates and excess inventory," with inventory numbers being reported to have increased from $729 million in the first quarter to $984 million, a 12.6% increase, with the Finished Goods Inventory ballooning from $303 million to $487 million, a staggering growth rate of 46.4%. Defendant Lando explained these high inventories as a result of "growth in demand has tapered off, distributors are taking a more cautious approach in order to better manage their cash flow." Defendant Faier, when discussing the Company's internal increases in Finished Goods Inventory to, *inter alia*, "slower growth rates in Europe."

154.    Regarding the projections for the upcoming third quarter, Defendant Faier revealed that there was going to be an estimated decline in the Company's financial outlook. Defendant Faier revealed that solar revenues would likely be between $850 million and $890 million in the third quarter, despite being at $947.4 million in the second quarter. Defendant Faier also revealed a gross margin estimation of between 30% and 33%, down from 34.7% in the second quarter.

155.    In trying to lessen the impact these negative disclosures had, Defendant Lando reiterated that:

> In Europe, installation rates continue to be high in both residential and commercial. However, the strength in the market is somewhat more moderate than what was anticipated heading into 2023, largely due to a milder winter, reduced concerns over energy resilience, and lower electricity prices. With that in mind, our growth in Europe in the second quarter was very strong. Overall, our megawatt shipments to Europe grew by 52% quarter over quarter, including 57% in residential and 50% quarter-over-quarter growth in commercial.

156.    Further, in regards to the impact increase in inventories had on demand, Defendant Lando made it a point to emphasize that the high levels of inventory did not reflect declining demand, and that Distributors were simply overreacting by:

> [G]oing to a – on the overall offering to low levels of inventory that are maybe lower than those that they would normally carry in this type of a period, especially because the overall demand is still high . . . the market is very active. ***Installations are up and demand for equipment is strong.***

157.    Despite the negative news, the 2Q 2023 Earnings Call was also littered with supposedly positive statements about the Company in order to throw analysts and investors off the scent. For one thing, Defendant Lando opened the 2Q 2023 Earnings Call by announcing that SolarEdge's "[r]evenues from [the] solar business were at a record $947 million," an increase of 38% more than the second quarter from the 2022 Fiscal Year. Defendant Lando claimed this growth was "mostly driven by record revenues in Europe," insisting that "consider[ing] the very high sales through and installation rates, it's not a major bubble, if you will." In short, Defendant Lando was spinning the elevated inventory rates and slowing growth into mere irregularities. Defendant Lando neglected to mention to investors however, that the Company's "record revenues" were the result of the Unneeded Product Misconduct.

158.    For his part, Defendant Faier explained the high inventory levels "[a]s a result of the slowdown in the shipments to the United States, slower growth rates in Europe, and more streamlined manufacturing, [the] finished goods inventory increased substantially this quarter." While "there is a built inventory within the channels [in Europe] that needs to be cleared in order to continue and grow," Defendant Faier assured analysts that "this will be cleared mostly through the adoption or getting more inverters from us during the third and fourth quarter." However, Defendant Faier also made it a point downplay these increased inventories as a good thing, reassuring analysts on the 2Q 2023 Earnings Call that the high inventory levels were "a healthy way to reduce shipment costs, in the various regions," reiterating that while the Channel Inventories were high, "*when you look at the days outstanding, which is a result of the sell-through from the channel, they are not high at all. They're actually at normal level*."

159.    Regarding demand numbers, Defendant Faier told investors that "[s]o the underlying demand is very strong, although not as strong as everyone thought." However, in an

attempt to spin his statement, Defendant Faier went on to say that "when we are looking at the point-of-sale data of how much is being sold from the channels, we see record levels over the last two quarters that, to our understanding, are continuing, which means that in that case, *the demand is there*." Defendant Faier also stated, in response to an analyst question about rebalancing in the third or fourth quarter, that "yes, *the correction within the distributors should be relatively quick, given the fact that the inventories levels that Zvi mentioned before are not so high when it reflects inventory days while we still see very high – record-high point-of-sale data*."

160.    In response to a question from an analyst, Defendant Faier stated that:

> We've been and we've seen through various stages of the solar market. We do not see this stage, as was the case in Germany, let's say, or Europe in 2013 when the market disappeared. Again, we see it more of a correction rather than a crisis that's going around overall.

Defendant Faier later reiterated that "Europe is growing, and the commercial side is also growing . . . If you combine those two, yes, the expectation should be that, in 2024, where we believe that, first of all Europe will come back to course – course much quicker than the United States." Defendant Faier also neglected to mention to investors the Unneeded Product Misconduct attributing to the "record revenues."

161.    The positive spin of the state of the Company done on the 2Q 2023 Earnings Call appeared to be enough to convince some analysts to remain positive on SolarEdge's future. On August 2, 2023, Oppenheimer & Co. released an analyst report stating that "Management sees European inventory reduction as mainly a 3Q event, with three-phase inverter supply gating sell-through of battery inventory," while Guggenheim released an analyst report stating that "In Europe, problems are more transitory in SEDG's view and ours, although we note that competitive pressure from Chinese vendors is clearly increasing." Lastly, Barclays issued an analyst report that, while optimistic, rated SolarEdge as "Overweight." This rating meant that the analysts felt

that SolarEdge's stock is likely to perform better in the future, attributing it to the Company "hold[ing] a strong position in both residential and commercial solar markets, both domestically and abroad, and presents significant upside growth within its European exposure and storage product."

162.   However, this positivity was not enough to protect the Company's stock. On the news of the high inventory levels in Europe, the Company's share price dropped $43.96 per share, from a closing price of $239.47 per share on August 1, 2023 to close at a price of $195.51 per share on August 2, 2023, a fall of 18.3%.

**August 8, 2023 Oppenheimer Conference**

163.   On August 8, 2023, Defendant Faier spoke with analysts at the Oppenheimer & Co. 26th Annual Technology, Internet & Communications Conference ("Oppenheimer Conference"). In his discussion with attendees, Faier reassured analysts that they could rely on the Company's allegedly strong demand for SolarEdge products in Europe. Defendant Faier explained to analysts that:

> Europe is growing only 30% to 40% year-over-year. It depends on the country, of course. Europe is made out of many countries. And therefore, we still see very strong underlying demand for -- last quarter, for example, we get from our channels and distributors what we call point-of-sale data, is showing how much we're selling out of the channels. We're talking about record high numbers that we haven't seen before. That in some cases, even for our products are close to 100% just compared to about a quarter ago. ***So the underlying demand is very strong, although not as strong as everyone thought***.

164.   Regarding the supposed surpluses, Faier explained them as simple changes in Distributors' inventory preferences, stating:

> ***The second thing distributors are doing is since they can rely better on our supply right now*** instead of holding 3 months or sometimes even 4 months of inventory . . . at the end of Q2, we saw in average 2 months of inventory of our product in the channel. And now they're even sometimes reduced to 5 or 4 weeks. And ***this creates a situation or on one hand, you see amazing demand. But at the same***

*time, since the inventory is still being cleared from the channel going to lower levels, the orders to us or other companies is not happening.*

*September 6, 2023 Barclays Conference*

165.    On September 6, 2023, Defendant Faier took part in a talk with analysts at the Barclays CEO Energy-Power Conference (the "Barclays Conference"). In response to a question from an analyst about whether Distributors have a say in how much they are able to reduce the price of SolarEdge products to increase sales to end users, Defendant Faier alluded to how SolarEdge recognizes revenues, responding, "[n]o. Not necessarily, ***because once we sold, it's theirs*** . . . it's their decision." However, despite SolarEdge recognizing revenue upon sale to Distributors and not end users, Faier also made clear that the Company is aware of how much Distributors are selling, stating "[w]e are seeing every quarter the sell-through data coming from our distributors."

166.    In discussing the demand for SolarEdge products, Defendant Faier seemed to be less forthcoming with analysts than he had in the past, acknowledging to attendees that Distributors' attempts to push out orders. Defendant Faier stated, *inter alia*, "[w]e do see that in some cases, [Distributors] ask to delay orders. Sometimes even delay orders that they know that they will need in Q4, they will ask to delay right now, because they do not want to take any cash flow obligations that they will not be able to meet." However, instead of acknowledging that European Distributors were actively doing this, as well as attempting to cancel or refuse to take additional products because of declining demand, Defendant Faier told attendees about how, in 2022, SolarEdge, "***directed a lot of our shipments to Europe, which by the way turned to be a relatively good move given the fact that we see Europe growing relatively quickly right now***."

167.    Defendant Faier was then asked, moments later, if he was able to provide an update regarding inventory in Europe now that the Company was a couple of months removed from the 2Q 2023 Earnings Call. In response, Defendant Faier stated:

> I'll start by saying that **nothing changed from our call** with only colors being a little bit more vivid in where do we see things happening. So starting from the underlying demand, **the underlying demand in Europe continues to be strong and continues to be very** great . . . I can tell you that in both cases, we see a very nice uplift in all of Europe . . . we see it almost everywhere. It's a very good underlying demand, not as good as we thought.

168.    In discussing the surplus Channel Inventories, Defendant Faier explained to investors that they were due to the "past 2 years' experience of not being able to get all of the products that they wanted." In short, Distributors had, according to Defendant Faier,

> **[S]imply overstocked, not just compared to the amount of revenues, but also because they thought that maybe they will not be able to get more products**. This resulted in a situation where although we see **record high sell-through every month**, we see that the channels are relatively packed.

Defendant Faier took this as an opportunity to reestablish that "the underlying market in Europe is growing and growing very nicely."

### September 21, 2023 KeyBanc Symposium

169.    On September 21, 2023, Defendant Lowe, speaking on behalf of the Company, took part in a question-and-answer session with analysts at the KeyBanc Capital Markets Inc.'s Energy Transition Symposium (the "KeyBanc Symposium"). During the KeyBanc Symposium, Defendant Lowe responded that nothing had changed when asked for comment on the current inventory cycle, responding that "[t]he situation that European distributors have in terms of having too much inventory . . . especially on solar panels, which is the largest cost component of the solar system . . . [i]s a real problem for them," as solar panel prices have fallen. However, Defendant Lowe also made it a point to state that "**underlying demand for solar is very, very strong**," and

"*the data we see from our distributors is continuing to show significant growth in terms of sell-through into Europe*." Defendant Lowe also reaffirmed to attendees not to be concerned, because "at the end of the day, 1Q is going into the spring installation season and sell-through being as strong as it is, *distributor inventories are going to be depleted fairly quickly*."

170.    The statements in ¶¶ 155-169 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe, the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

171.    The truth fully emerged less than a month after the KeyBanc Symposium, as the Unneeded Product Misconduct finally caught up with SolarEdge. On October 19, 2023, after the market closed, SolarEdge issued the 3Q 2023 Press Release.

172.    The 3Q 2023 Press Release revealed a slew of disappointing results and guidance, revealing that:

> "During the second part of the third quarter of 2023, *we experienced substantial unexpected cancellations and pushouts of existing backlog from our European distributors*," said Zvi Lando, Chief Executive Officer of SolarEdge. "We attribute these cancellations and pushouts to *higher than expected inventory in the channels* and slower than expected installation rates. In particular, installation rates for the third quarter were much slower at the end of the summer and in September where traditionally there is a rise in installation rates."

173.    The effect of these revelations was felt by the Company immediately, with the 3Q 2023 Press Release further revealing:

> As a result, third quarter revenue, gross margin and operating income will be below the low end of the prior guidance range. Additionally, the Company anticipates significantly lower revenues in the fourth quarter of 2023 as the inventory destocking process continues.
>
> ***
>
> Third quarter revenue is now expected to be in the range of $720 million to $730 million, compared to the previous expectation of $880 million to $920 million.

174.    The sudden heel turn by SolarEdge shocked analysts and investors alike. Oppenheimer & Co. issued an analyst report that practically alleged the Individual Defendants as having misinforming the investing public, stating that "[w]ith Thursday's pre-announcement, [SolarEdge] *signaled much deeper challenges than previously suggested by management commentary*." Several analysts subsequently downgraded the Company in their reports.

175.    On this news, the Company's share price dropped $31.08 per share, or 27.2%, from a closing price of $113.98 per share on October 19, 2023 to close at a price of $82.90 per share on October 20, 2022.

## SUBSEQUENT DEVELOPMENTS

***November 1, 2023 Earnings Call***

176.    On November 1, 2023, after the market closed, the Company hosted its investor earnings call for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Earnings Call"). On the 3Q 2023 Earnings Call, the preliminary financials from the 3Q 2023 Press Release were given more light, as it was revealed that the Company's revenue in the third quarter from the solar business fell from $947.4 million in the second quarter to $725.3 million in the third quarter, a 23.4% drop between quarters and between 14.7% to 18.5% *lower than* the estimated $850 million to $890 million estimated on the 2Q 2023 Earnings Call.

177.    With their tails between their legs, Defendants Lando and Faier both acknowledged the decline in demand in Europe during their scripted remarks. Defendant Lando admitted that demand in Europe "began to slow in the third quarter," revealing that "[a]lthough the dynamics are consistent with what we cautioned during our second quarter earnings call, the magnitude grew much greater than we anticipated." In explaining the shortfall in missed guidance and revenue, Defendant Lando made it clear that it was due to Europe, stating that "in Europe, our sell-through was . . . ***down 22% quarter over quarter***," whereas "the U.S. [w]e have not seen a significant change in the market dynamics since" the 2Q 2023 Earnings Call. Defendant Lando further made clear that this was no longer a short-term issue, as based on the "inventory data that we received from our distributors, we estimate the correction ***could take two to three quarters of gradual improvement*** quarter over quarter." Thus, in order "[t]o align with reduced demand, [SolarEdge has] discontinued manufacturing of our products in Mexico and reduced capacity in China."

178.    As for Defendant Faier's scripted remarks, he confirmed that:

A significant portion of our revenues decline in Europe are attributed to lower sales of batteries or a combination of inventories in the beginning of the quarter and ***lower demand than anticipated by our customers*** led to an accumulation of large quantities of channels.

179.    In the question-and-answer portion of the 3Q 2023 Earnings Call, analysts tried to determine when Defendants became aware of the slowdowns, especially given the public remarks being made in the months leading up to the 3Q 2023 Press Release (i.e. at the Oppenheimer Conference, Barclays Conference, and KeyBanc Symposium). In response to a statement from a J.P. Morgan analyst who intuited that the slowdowns accelerated in the back half of the third quarter, Defendant Lando admitted that "the shift in pattern was round the summer and the picture got clearer, as mentioned during the -- to our distributors, and *then to us in the second half of the quarter. And that is where the installation rate decline took place*."

180.    At a later portion of the question-and-answer session, in response to another request for clarity into how the financial results got to where they were at the call, Defendant Faier clarified Defendant Lando's statement, explaining that the difficulty for the Company to recognize a decline in demand was because the Company was receiving sell-through reports late in each month, with a sell-through report being for the prior month (i.e. the sell-through report for January would come in late-February). Because of this, the demand declines that were seen in July and August were mistaken for typical seasonal declines, and the Distributor cancellations did not begin to come in until the last two weeks of the quarter. However, this apparent justification needed to be taken with a grain of salt, as based on his comments, Defendant Faier was implying that SolarEdge lost $125 million to $250 million in revenue over just two weeks.

181.    Additionally, on the 3Q 2023 Earnings Call, Defendant Lando seemed to imply some of the allegations made regarding the Unneeded Product Misconduct, namely CW4's claim of the Company's refusal to permit Distributors to cancel orders. Defendant Lando stated on the call that European Distributors had made a "large amount of requests to cancel or push out orders"

and that "*while these orders are technically binding on our distributors*, the nature of our relationship with these customers is such that we accommodated most of these requests."

### *February 20, 2024 Earnings Call*

182.    On February 20, 2024, months after the end of the Relevant Period, the Company hosted its investor earnings call for the fourth quarter and full year of the 2023 Fiscal Year (the "FY 2023 Earnings Call"). On the FY 2023 Earnings Call, Defendant Faier announced that:

> Throughout this [fourth] quarter, we did a lot of work going deeper in to our channels to understand what's happening there, looking at installation rates, dissecting almost every country by various trends that we see there, and talking, by the way, to a lot of the installers to actually understand exactly what they see as well, which was one of the things that we did a little bit less prior to this period.

In essence, Defendant Faier revealed to investors that the constant insistence that demand in Europe was strong throughout the Relevant Period was done *without actually speaking to those who were contracted to install the Company's products*.

### <u>DAMAGES TO SOLAREDGE</u>

183.    As a direct and proximate result of the Individual Defendants' conduct, SolarEdge will lose and expend many millions of dollars.

184.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

185.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Unneeded Product Misconduct.

186.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the Unneeded Product Misconduct and any

other misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

187.   Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

188.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

189.   As a direct and proximate result of the Individual Defendants' conduct, SolarEdge has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

190.   Plaintiff brings this action derivatively and for the benefit of SolarEdge to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of SolarEdge, unjust enrichment, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

191.   SolarEdge is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

192.   Plaintiff is, and has been at all relevant times, a shareholder of SolarEdge. Plaintiff will adequately and fairly represent the interests of SolarEdge in enforcing and prosecuting its

rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

193.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

194.    A pre-suit demand on the Board of SolarEdge is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Lando, Atkins, Gani, Gross, Hoke, More, Payne, and Zafrir (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

195.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Unneeded Product Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

196.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted SolarEdge to engage in the Unneeded Product Misconduct and in making and/or causing the Company to make materially false and misleading statements. Specifically, the Director-Defendants caused SolarEdge to issue false and misleading statements which were intended to make SolarEdge appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal

controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

197.    Additional reasons that demand on Defendant Lando is futile follow. Defendant Lando has served as the Company's CEO and as a Company director since 2020. Previously, he served as the Vice President of Global Sales for the Company from 2009 until being appointed as interim CEO in 2019. As the Company's CEO throughout the Relevant Period, Defendant Lando is ultimately responsible for the Company's engagement in the Unneeded Product Misconduct and all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he personally made in the FY 2022 Earnings Call, the 1Q 2023 Earnings Call, and the 2Q 2023 Earnings Call. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Gani and Payne, which allowed them to continue making false and misleading statements. The Company provides Defendant Lando with his principal occupation for which he receives handsome compensation including over $7.5 million during the 2023 Fiscal Year. Thus, as the Company admits, he is a non-independent director. As the Company's former highest officer, Defendant Lando conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lando is a defendant in the Securities Class Action. For these reasons, Defendant Lando faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Atkins is futile follow. Defendant Atkins has served as a Company director since 2021. She also serves as the Chair of the Nominating and Corporate Governance Committee, as a member of the Technology Committee, and as a member of the Compensation Committee. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Gani and Payne, which allowed them to continue making false and misleading statements. Defendant Atkins has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, Defendant Atkins conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Atkins faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Gani is futile follow. Defendant Gani has served as a Company director since 2015.  He also serves as the Chair of the Audit Committee. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendant Payne, which allowed them to continue making false and misleading statements. Defendant Gani has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, Defendant Gani conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes,

and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gani faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.   Additional reasons that demand on Defendant Gross is futile follow. Defendant Gross has served as a Company director since 2023.  She also serves as a member of the Audit Committee. Defendant Gross has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, Defendant Gross conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Gross faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.   Additional reasons that demand on Defendant Hoke is futile follow. Defendant Hoke has served as a Company director since 2022.  He also serves as a member of the Nominating and Corporate Governance Committee. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Gani and Payne, which allowed them to continue making false and misleading statements. Defendant Hoke has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, Defendant Hoke conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect

corporate assets. For these reasons, Defendant Hoke faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

202.   Additional reasons that demand on Defendant More is futile follow. Defendant More has served as a Company director since 2006.   He also serves as the Chair of the Compensation Committee and as the Chair of the Technology Committee. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Gani and Payne, which allowed them to continue making false and misleading statements. Defendant More has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, Defendant More conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant More faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

203.   Additional reasons that demand on Defendant Payne is futile follow. Defendant Payne has served as a Company director since 2015.   She also serves as a member of the Audit Committee. She also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of herself and Defendant Gani, which allowed them to continue making false and misleading statements. Defendant Payne has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, Defendant Payne conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements,

consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Payne faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

204. Additional reasons that demand on Defendant Zafrir is futile follow. Defendant Zafrir has served as a Company director since 2019. He also serves as the Chair of the Board, as a member of the Compensation Committee, as a member of the Nominating and Governance Committee, and as a member of the Technology Committee. He also solicited the 2023 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Gani and Payne, which allowed them to continue making false and misleading statements. Defendant Zafrir has received and continues to receive compensation for his role as a director as described above. As a trusted Company director and the Chairman of the Board, Defendant Zafrir conducted little, if any, oversight of the schemes to cause the Company to engage in the Unneeded Product Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zafrir faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205. Additional reasons that demand on the Board is futile follow.

206. Defendants Gani (as Chair), Gross, and Payne (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to making false and misleading statements to the investing public, and to

facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, including as it pertained to the Unneeded Product Misconduct, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

207.    In violation of the Codes of Conduct, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Unneeded Product Misconduct and to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In addition, the Individual Defendants violated the Codes of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Codes of Conduct, are not disinterested, and demand is excused as to them.

208.    SolarEdge has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for SolarEdge any part of the damages SolarEdge suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

209.    The acts complained of herein constitute violations of fiduciary duties owed by SolarEdge's officers and directors, and these acts are incapable of ratification.

210.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

211.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of SolarEdge. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of SolarEdge, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if

such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

212. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Solar-Edge to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

213. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

216. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

217.    Under the direction and watch of Defendants Lando, Zafrir, Atkins, Gani, Hoke, More, and Payne, the 2023 Proxy Statement failed to disclose: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe, the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls.

218.    Moreover, the 2023 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate and that the Codes of Conduct were not complied with, as evidenced by the Individual Defendants: (1) participating in and/or facilitating the Company's participation in the Unneeded Product Misconduct; (2) making and/or causing the Company to make numerous false and misleading statements and omissions alleged herein; and (3) failing to report violations of the Codes of Conduct.

219.    Defendants Lando, Zafrir, Atkins, Gani, Hoke, More, and Payne knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the

statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement.

220.    The misrepresentations and omissions in the 2023 Proxy Statement were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination therein, including but not limited to: (1) reelect Defendants Gani and Payne to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) to appoint Ernst and Young as the Company's independent registered public accounting firm for the 2023 Fiscal Year; (3) to approve executive compensation, on an advisory basis; (4) to vote on executive compensation annually, on an advisory basis; (5) to amend the Certificate of Incorporation to declassify the Board and hold annual elections; (6) to amend the Certificate of Incorporation to remove the supermajority voting requirement for future amendments to the Certificate of Incorporation and Company bylaws; and (7) to amend the Certificate of Incorporate to add a federal forum selection provision for causes of action that arise under the Securities Act of 1933..

221.    The Company was damaged as a result of Defendants Lando, Zafrir, Atkins, Gani, Hoke, More, and Payne's material misrepresentations and omissions in the 2023 Proxy Statement.

222.    Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SolarEdge's business and affairs.

225.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SolarEdge.

227.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Unneeded Product Misconduct.

228.    In breach of their fiduciary duties owed to SolarEdge, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the reason the Company was not only hitting "record" revenues, but simply just reaching financial goals, was because the Company was forcing unneeded products on Distributors at the end of the fiscal quarters; (2) demand in Europe, the Company's most valuable region, was severely declining (3) by forcing unneeded products on Distributors who had a declining demand, the Finished Goods Inventory and Channel Inventories were ballooning to unsustainable levels; (4) SolarEdge's sell-through projections (i.e., sales from the Company's Distributors to installers and other end users) were artificially inflated as they were not based on either market reports nor the Company's internal data; (5) as a result of the foregoing, the Individual Defendants were aware of, or should have been aware of, the risk of Channel Inventories rising to a level such that Distributors would need to cancel and/or push out their current orders; (6) as a result Company revenues would plummet; and (7) the Company failed to maintain internal controls.

229.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

230.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

231.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

232.    In yet further breach of fiduciary duties, during the Relevant Period, Defendant Faier engaged in an insider sale, netting proceeds of approximately $16,710, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

233.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

234.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Unneeded Product Misconduct and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Unneeded Product Misconduct set forth herein, and that internal controls were not

adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Unneeded Product Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

235.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

236.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SolarEdge has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

237.    Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

238.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SolarEdge.

240.    The Individual Defendants either benefitted financially from the improper conduct and their making insider sales, or received profits, bonuses, stock options, or similar compensation from SolarEdge that was tied to the performance or artificially inflated valuation of SolarEdge, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

241. Plaintiff, as a shareholder and representative of SolarEdge, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

242. Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

243. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SolarEdge, for which they are legally responsible.

245. As a direct and proximate result of the Individual Defendants' abuse of control, SolarEdge has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

246. Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

247. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of SolarEdge in a manner consistent with the operations of a publicly held corporation.

249.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, SolarEdge has sustained and will continue to sustain significant damages.

250.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

251.    Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Lando, Faier, Danziger, and Lowe for Contribution Under Sections 10(b) and 21D of the Exchange Act

252.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

253.    SolarEdge and Defendants Lando, Faier, Danziger, and Lowe are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Lando, Faier, Danziger, and Lowe's willful and/or reckless violations of their obligations as officers and/or directors of SolarEdge.

254.    Defendants Lando, Faier, Danziger, and Lowe, because of their positions of control and authority as officers and/or directors of SolarEdge, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SolarEdge, including the wrongful acts complained of herein and in the Securities Class Action.

255.     Accordingly, Defendants Lando, Faier, Danziger, and Lowe are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

256.     As such, SolarEdge is entitled to receive all appropriate contribution or indemnification from Lando, Faier, Danziger, and Lowe.

## SEVENTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

257.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

258.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

259.     In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

260.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261.     Plaintiff, on behalf of SolarEdge, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of SolarEdge, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to SolarEdge;

(c)     Determining and awarding to SolarEdge the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing SolarEdge and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect SolarEdge and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of SolarEdge to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding SolarEdge restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Date: June 10, 2024

Respectfully Submitted,

**THE BROWN LAW FIRM P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
         shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Jonathan Blaufarb, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 18__ day of May, 2024.

*Jonathan Blaufarb*
_____
Jonathan Blaufarb